EUGENE CAMPAGNA,
        -Plaintiff


    -v-                                 CIVIL  3:05 CV 517 (DJS)


JO ANNE B. BARNHART,
        -Defendant

## MAGISTRATE JUDGE'S OPINION

This is an action under 42 U.S.C. §405(g).  Cross-motions for
judgment on the administrative record are pending.  For the reasons
that follow, an order should enter affirming the decision to deny
benefits.  If plaintiff believes he is presently disabled, he is
free to file a new application for Title XVI benefits with a new,
appropriate onset date.

The plaintiff was awarded disability benefits under Title II
and XVI in April 1992, with an onset date of October 1990.  In
1995, a review was conducted of plaintiff's condition.  This review
found that narcotics abuse had been material to the 1992
administrative finding of disability and, therefore, a cessation of
plaintiff's benefits was ordered. Plaintiff appealed this
determination and, eventually, on September 11, 1998, ALJ Samuel
Kanell issued a decision finding that the termination of

plaintiff's benefits had been appropriate.

Plaintiff appealed ALJ Kanell's decision.  The Appeals Council granted plaintiff a new hearing.  This hearing was held before ALJ Ronald Thomas in June 2000.  In December 2000, ALJ Thomas issued a decision which again found that plaintiff's benefits were correctly terminated.

Plaintiff appealed ALJ Thomas's decision to the U.S. District Court.  District Judge Janet C. Hall granted a motion by the Commissioner to remand the matter for a new hearing.  Another hearing was held before ALJ Ronald Thomas on June 20, 2004.  On July 26, 2004, ALJ Thomas once again rendered a decision that was adverse to the plaintiff, finding that the decision to terminate plaintiff's benefits had been and is proper.  The plaintiff, who was represented by legal counsel at all of his hearings and in the present case, has appealed this most recent decision to this court alleging an array of shortcomings in the administrative process. Because the Commissioner's findings are supported by adequate evidence, and because, fairly considered, it does not appear that the administrative decision is legally wrong or otherwise mistaken, the Commissioner's decision should be affirmed.

Plaintiff was born in 1954. He has a tenth grade education. In 1985, while working as a painter, he fell from a ladder. He hurt his back and was taken to the hospital, from which he was discharged that same day.  The fall allegedly exacerbated

congenital scoliosis, causing great pain.  Shortly thereafter plaintiff began to self-medicate with heroin.  The plaintiff has also used methadone allegedly both to manage his pain and for relief from his heroin addiction.  To get increased dosages of methadone, he has admittedly told the methadone clinic personnel what they "wanted to hear." (Tr. 40)  As late as May 2003, plaintiff was incarcerated for, among other things, possession of drug paraphernalia (Tr. 633)  Plaintiff Campagna admits he has "a long history of using heroin, cocaine, and alcohol for pain relief." (Plaintiff's Brief at 3, ¶1)

In reviewing a decision of the Commissioner under § 405(g), the district court performs an appellate function.  <u>Zambrana v. Califano</u>, 651 F.2d 842, 844 (2d Cir. 1981); <u>Igonia v. Califano</u>, 568 F.2d 1383, 1387 (D.C. Cir. 1977).  A reviewing court will "set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." <u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998).  <u>See also</u> <u>Alston v. Sullivan</u>, 904 F.2d 122, 126 (2d Cir. 1990)("As a general matter, when we review a decision denying benefits under the Act, we must regard the [Commissioner's] factual determinations as conclusive unless they are unsupported by substantial evidence")(citations omitted).  "Substantial evidence" is less than a preponderance, but "more than a scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v.</u>

Perales, 402 U.S. 389, 401 (1971)(quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  See Yancey v. Apfel, 145 F.3d 106, 110 (2d Cir. 1998); Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).

In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).  See also New York v. Sec'y of Health and Human Servs., 903 F.2d 122, 126 (2d Cir. 1990)(stating that the court, in assessing whether the evidence which supports the Commissioner's position, is required to "review the record as a whole")(citations omitted).  Still, the ALJ need not "reconcile every conflicting shred of medical testimony."  Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981).  In sum, "the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision."  Morris v. Barnhardt, 02 Civ. 0377 (AJP), 2002 U.S. Dist. LEXIS 13681, at *12 (S.D.N.Y. July 26, 2002).

The regulations promulgated by the Commissioner establish a five-step analysis for evaluating disability claims.  Bowen v. Yuckert, 482 U.S. 137, 140-142 (1987); 20 C.F.R. § 404.1520. First, the Commissioner considers if the claimant is presently working in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(I).  If not, the Commissioner next considers if the claimant has a medically severe impairment.  Id. § 404.1520

(a)(4)(ii).  If the severity requirement is met, the third inquiry is whether the impairment is listed in Appendix 1 of the regulations or is equal to a listed impairment.  Id. §§ 404.1520 (a)(4)(iii); Pt. 404, Subpt. P. App. 1.  If so, the disability is deemed established without further analysis.  If not, the fourth inquiry is to determine whether, despite the severe impairment, the claimant's residual functional capacity allows him or her to perform any past work.  Id. § 404.1520(a)(4)(iv).  If a claimant demonstrates that no past work can be performed, it then becomes incumbent upon the Commissioner to come forward with evidence that substantial gainful alternative employment exists which the claimant has the residual functional capacity to perform.  Id. § 404.1520(a)(4)(v).  If the Commissioner fails to come forward with such evidence, the claimant is entitled to disability benefits.  Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990); Berry, 675 F.2d at 467.

ALJ Thomas made thirteen (13) specific findings in support of his July 2004 decision.  Findings 1, 2, 3, 7, 8, 9, and 10 are not at issue. (Tr. 414)  At issue are findings 4, 5, 6, 11, 12, and 13.  These findings are as follows:

> 4.   [Plaintiff's] medically determinable impairments to not meet or medically equal one of the listed impairments in Appendix 1, Subpart P., Regulation No.4.
>
> 5.   [Plaintiff's] . . . allegations regarding his limitations are not totally credible for the reasons set forth in the body

-5-

of the decision.

> 6. [Plaintiff] has the following residual functional capacity: he can perform the demands of light work in a supervised, low stress environment requiring few decisions with only occasional bending, stooping, twisting, squatting, kneeling, crawling, climbing and balancing.

> 11. [Plaintiff] has the residual functional capacity to perform a significant range of light work (20 CFR §§ 404.1567).

> 12. Although [plaintiff's] exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.10 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work a a bench assembler and production inspector.

> 13. [Plaintiff was not under a "disability," as defined by the Social Security Act, at any time through the date of this decision since his benefits were ceased in January 1996 (20 CFR §§ 404.1520(g) and 416.920(g)

The court concludes that each of these findings is supported by "substantial evidence" and that the ALJ's decision does not appear to be the product of legal error or otherwise wrong.

**1. Does Not Meet or Equal a Listed Impairment**

A Social Security claimant bears the burden of showing that his impairments meet or equal a "listed impairment." Dudley v. Secretary of Health and Human Services, 816 F.2d 792, 793 (2d Cir. 1987). Here, plaintiff argues that the ALJ erred in failing to

find that his impairments met or equaled those set forth in Listing 12.09, which deals with Substance Abuse Disorders. However, as plaintiff himself acknowledges in his memorandum, "[t]his listing is no longer sufficient unto itself to determine disability, as it was at the time of [p]laintiff's original adjudication." (Plaintiff's Memorandum at 5)  Instead, Listing 12.09 now serves only as a reference to other mental and physical impairments under which a claim may be made in an appropriate case.  Thus, it was not error for the ALJ to have concluded that plaintiff's impairments did not meet or equal Listing 12.09.

The plaintiff next argues that the ALJ erred in not concluding that plaintiff's impairments met or equaled those set forth in Listing 12.04, which deals with Affective Disorders. To be found disabled under this listing, a plaintiff must meet or equal the criteria of *both* 12.04 A and B.  To satisfy the demands of 12.04 B, a plaintiff must prove that his restrictions are "*Marked*."  The regulation, therefore, implicitly vests the Commissioner with discretion to evaluate the degree and extent of claimed restrictions.  There is ample evidence to support a finding that plaintiff's restrictions were not sufficiently severe to be "marked" within the meaning of the regulation.

Among the record evidence to support this conclusion are the several psychiatric reviews and residual capacity assessments which indicate that, to the extent plaintiff has psychiatric issues, they

are not sufficiently significant to preclude employment, that his activity is only mildly limited, that his depression is mild, and that plaintiff tends to "lack motivation." (Tr. 93, 101-103)  In this regard, consulting psychologist Dr. Kevin Murphy specifically notes that plaintiff's restrictions and difficulties are "mild," not "marked."  (Tr. 588, 590)  Consulting physician Thomas Hill, M.D., also found that plaintiff's relevant restrictions and difficulties fell below the level of "marked."  Doctor Hill also noted that plaintiff did not at the time allege a worsening of his psychiatric problems, his complaints were "somewhat dramatic" and "marginally credible," and that medical or hospital records corroborating plaintiff's claims were lacking. (Tr. 608, 610) Dr. Hill also opined that plaintiff can relate appropriately to work peers and supervisors. (Tr. 595) Further, as the ALJ noted, there is no evidence that plaintiff received treatment for depression between the time he "was awarded benefits until October 1995 when he was sent for a consultative examination . . . for the purpose of his continuing disability review." (Tr. 409, ¶4)  As noted elsewhere, the ALJ was not required to believe plaintiff's testimony as to the extent of his claimed restrictions.  Moreover, illegal drug abuse is a recurring theme that appears at least partially responsible for plaintiff's depression and its effects upon his activities.  The foregoing satisfies the "substantial evidence" standard.

Finally, plaintiff asserts that the ALJ erred in not concluding that his impairments met or equaled those of Listing 12.07, which deals with Somatoform Disorders. This argument fails, however, because Listing 12.07 B also requires a finding of "marked" restrictions or difficulties. The same substantial evidence which underlies plaintiff's failure to satisfy the requirements of 12.04 B supports the conclusion that he has failed to satisfy the criteria of 12.07 B.

## 2. The ALJ's Handling of Dr. Jones's Evidence

Plaintiff faults the ALJ's handling of evidence from William Jones, M.D. On July 11, 1991 plaintiff underwent a consultative physical examination by his treating orthopedist, William Jones, M.D. (Tr. 856-858) Doctor Jones's written opinion is quoted at length in the ALJ's decision. (Tr. 407-408) Orthopedist Jones found that physically the plaintiff was "capable of all forms of gainful manual labor and generalized employment." Doctor Jones then went on to find:

> This man's pain problem is primarily psychological. Symptomatology is so overwhelmingly subjective and totally lacking in objective findings as to defy diagnosis by conventionally acceptable patho-physiological (orthopedic) standards. His overtly negative and cynical demeanor modified by drug addiction reflects an unhappy person with a deep seated mental depression with some suicidal tendencies. From the time of his injury in 1985, he has considered himself to be far more seriously injured than was realized by his doctors, and he still desperately yearns for this recognition. He

was seriously offended by being sent home on the day of his injury instead of being hospitalized and fussed over. This examiner believes he would greatly benefit from attending a pain clinic where his obsessions with pain could be curtailed through self-hypnosis. Without this kind of psychological help, the prognosis in this case is hopeless with no chance to correct his heroin addiction. **Although essentially physically normal as documented by this examination with an asymptomatic scoliosis which should render him capable of all forms of gainful manual labor and generalized employment, his present mental status renders him totally disabled for work of any kind.**

(Tr. 408)(ALJ's Emphasis).

Plaintiff acknowledges that the opinion of Orthopedist Jones as to plaintiff's mental status is well beyond the scope of Dr. Jones's competence and expertise, and "can therefore be criticized." (Plaintiff's Memorandum at 8) Nevertheless, plaintiff argues that since Dr. Jones is a treating physician, his opinion is entitled to "extra weight." (Id. at 8) The court agrees that Dr. Jones's opinion is entitled to extra weight, but only to the extent that it is a medical opinion, and only to the extent it is reasonably within the realm of his competence.

To be given controlling weight, an opinion of a treating physician must not only be "well-supported by medically acceptable clinical and laboratory diagnostic techniques," 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), but must also actually be a "medical opinion." Id. §§ 404.1527(d), 416.927(d). A bald statement that a patient is "disabled" or "unable to work" is not a medical

opinion. _Id._ §§ 404.1527(e)(1), 416.927(e)(1). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." _Id._ §§ 404.1527(a)(2), 416.927(a)(2). Whether an applicant's medical impairments render him disabled is a legal question, the determination of which is the province of the Commissioner of Social Security.

The obvious corollary to the treating physician rule is that where an opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques **_or_** is inconsistent with the other substantial evidence in your case record, the SSA will not afford the opinion **_controlling_** weight. In such an instance, the SSA will determine what weight to give the opinion based on other factors, such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, support by medical signs and laboratory findings, consistency with the record, and the specialization of the physician _vel non_. _Id._ § 404.1527(d)(2)-(6). Moreover, the SSA gives "more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." _Id._ § 404.1527(d)(1).

Here, Dr. Jones found that plaintiff's psychological symptoms were without objective support. Dr. Jones also found that, despite plaintiff's hyperbolic assessment of his physical condition, there was no physical reason plaintiff could not be gainfully employed doing at least light, and perhaps even more exertional work. Dr. Jones further appears to have found that plaintiff's symptomatology was severely affected by his drug addiction. These findings actually support the Commissioner. Beyond these, Dr. Jones's "findings" do not appear to be medical opinions, but rather legal conclusions which are not his to make. Therefore, the court finds that the ALJ did not violate the treating physician rule, but actually accorded Dr. Jones's opinion the weight it deserved. Dr. Jones's orthopedic opinion contributes to the substantiality of the evidence supporting the ultimate administrative decision.

### 3. The Assessment of John Monroe, M.D.

It appears that in May 2000, plaintiff visited a clinic, The Community Health Center in New London, and was seen by John Monroe, M.D. (Tr. 388) On July 12, 2000, Dr. Monroe submitted a "MEDICAL ASSESSMENT OF ABILITY TO DO WORK-RELATED ACTIVITIES (PHYSICAL)." (Tr. 389-390) Dr. Monroe expressed the opinion that, due to the effects of his scoliosis, plaintiff could lift only 10 pounds, and that his ability to sit, stand, walk and sit was limited to 4 hours per 8 hour day. Plaintiff argues that this is the opinion of a treating physician, and that it is binding on the Commissioner.

The plaintiff further argues that the ALJ improperly disregarded Dr. Monroe's opinion, and "does not say why he rejected that opinion." (Plaintiff's Memorandum at 10).

It would have been better if the ALJ had more fully articulated his reasons for not according more weight to Dr. Monroe's two page assessment form. But, contrary to plaintiff's assertion, the ALJ did offer an explanation for his handling of Dr. Monroe's opinion. The ALJ remarked in reference to Dr. Monroe's assessment form and opinion, "The one doctor who gave a severely restricted residual functional capacity does not even appear to have a regular and ongoing treating relationship with Mr. Campagna." (Tr. 412) This subordinate finding is supported by substantial evidence. There is no evidence that Dr. Monroe saw plaintiff *prior* to the examination leading to the July 2000 report that plaintiff's lawyer obtained. (Tr. 388) Only one document of record, an assessment report, suggests that plaintiff saw Dr. Monroe on three *subsequent* occasions: January 15, 2001; March 2, 2001; and April 4, 2001.

Doctor Monroe's July 2000 opinion is an isolated piece of evidence. In this voluminous record, Dr. Monroe is the only physician who opines that plaintiff suffers severe restrictions. The form he submitted is cryptic. There is little or no verbalization of the reasons underlying Dr. Monroe's assessments. There is no explanation of the extent, if any, to which plaintiff's

subjective complaints are channeled into Dr. Monroe's findings.
While Dr. Monroe examined plaintiff, there is no evidence as to the
treatment that preceded the assessment. These factors, taken in
conjunction with the ALJ's remarks, suggests that the ALJ was
focusing on the criteria embodied in 20 C.F.R. §§ 404.1527(d) and
416.927(d), which he had discretion to do.

These regulations permit the ALJ to examine the relationship
between plaintiff and Dr. Monroe. They also distinguish between
*examining* physicians and *treating* physicians. In particular, 20
C.F.R. § 404.1527(d)(2)(I) states:

> Length of the treatment relationship and the frequency of
> examination. Generally, the longer a treating source has
> treated you and the more times you have been seen by a
> treating source, the more weight we will give to the
> sources medical opinion. When the treating source has
> seen you a number of times and long enough to have
> obtained a longitudinal picture of your impairment, we
> will give the source's opinion more weight than we would
> if it were from a nontreating source.

<u>Also</u> <u>see</u> 20 C.F.R. § 416.927(d)(2)(I). The regulations also
explain that "The better an explanation a source provides for an
opinion, the more weight we will give that opinion." 20 C.F.R. §§
404.1527(d)(3) and 416.927 (d)(3). Thus, while it appears that Dr.
Monroe was a "treating" physician in the period after he opined
that plaintiff was disabled, it does not appear the ALJ was wrong
in focusing on the lack of evidence of significant treatment
preceding Dr. Monroe's assessment.

Here, the evidence submitted by Dr. Monroe contains little or

no explanation of his findings, and nothing to suggest that he possesses a *longitudinal* picture of the plaintiff. There is no other evidence in the record, apart from plaintiff's subjective complaints, that plaintiff's physical condition worsened significantly from the time of Dr. Jones's 1991 opinion that plaintiff was capable of a full range of light employment until the ALJ's July 2004 decision. It fairly appears that Dr. Monroe saw the plaintiff only once before writing the July 2000 report. Consulting physician reports between 1991 and Dr. Monroe's assessment suggest that, while plaintiff claimed to suffer from pain and has scoliosis, his physical examinations were normal, and he possessed a full range of motion (Tr. 200-203, 247-248). The ALJ also found in his decision that plaintiff had failed to show up for a consultative examination that had been ordered in connection with his most recently filed application for benefits (Tr. 411, ¶4). Finally, the ALJ found the plaintiff to be incredible. Taking all the foregoing into account, it supplies a corpus of evidence adequate to support the Commissioner's conclusion. There is "substantial evidence" that Dr. Jones's assessment of plaintiff's physical condition, rather than Dr. Monroe's, more accurately reflects plaintiff's capacity for work-related activities. Certainly Dr. Jones's assessment is consistent with the consulting assessments submitted in the post-Monroe period and provides a powerful explanatory narrative.

**4. The ALJ's Credibility Assessment**

The plaintiff acknowledges that an ALJ has the authority to make credibility determinations, and is not *required* to believe subjective complaints. Plaintiff, however, argues that in this case the ALJ's credibility assessment is faulty because it does not "set forth with specificity the reasons for doubting the Plaintiff's credibility." (Plaintiff's Memorandum at 11). Plaintiff asserts that a finding that a witness is not credible "must be set forth with sufficient specificity to permit intelligible plenary review." (Id.) Here, plaintiff maintains, the ALJ merely made "a vague reference" to credibility in the body of his decision.

In Finding No. 5, the ALJ stated that he "finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision." (Tr. 415) From this, a reviewing court can reasonably conclude that the ALJ did not believe the plaintiff with respect to the frequency, duration, and intensity of his pain, and the extent of his impairments. While it certainly would have been helpful if the ALJ had elaborated more on this subject, he did make specific references to observations on credibility made in the body of his decision. Specifically, the ALJ noted an incongruity between plaintiff's assertion that his physical condition had worsened and his failure to obtain medical treatment until he was notified that a

redetermination of his eligibility was underway. (Tr. 409-410) The ALJ stated that the record is "devoid of any medical treatment from the time he was awarded benefits to the time he was given notice that his benefits might be ceased and therefore reflects negatively on [his] credibility." (Tr. 409-410) Relying on Arnone v. Bowen, 882 F.2d 34, 39 (2d Cir. 1989), the Commissioner argues that a claimant's "failure to seek medical attention undercuts] a claim of continuous disability." Arnone appears to support the Commissioner in the circumstances of this case. It is not the sole basis of the ALJ's decision, however.

The ALJ also incorporated into his decision the written opinion of plaintiff's treating orthopedist, Dr. William Jones. This is most unusual. A reading of this opinion reveals why the ALJ incorporated it. The unmistakable import of Dr. Jones's opinion is that orthopedically the plaintiff is capable of "all forms of gainful manual labor and generalized employment." (Tr. 408) According to Dr. Jones, "[f]rom the time of his injury in 1995, [plaintiff] has considered himself to be far more seriously injured than was realized by his doctors. He was seriously offended by being sent home on the day of his injury instead of being hospitalized and fussed over." (Tr. 408) Dr. Jones found, in 1991, the plaintiff was "essentially physically normal." (Tr. 408) From this point until Dr. Monroe's July 2000 assessment, there is no credible evidence that plaintiff's *physical* capacity

-17-

changed for the worse, nor is there evidence subsequent to Dr. Monroe's assessment that plaintiff obtained treatment for the conditions Dr. Monroe noted.

Other Residual Functional Capacity assessments conducted shortly before, and subsequent to, Dr. Monroe's July 2000 assessment conflict with Dr. Monroe's assessment. The May 2001 assessment by osteopath Ronald Jolda notes marked scoliosis, but reports a "normal thoracic area. Full ROM." Dr. Jolda's report finds that plaintiff did not appear in pain, and had normal ambulation. (Tr. 565-566) Again in May 2001, Plaintiff was examined by Morgan Martin, M.D., whose report recounts plaintiff's complaints: "My disability is scoliosis. In addition, I fell 32 feet on October 16, 1985, and fell backwards and ripped the tendons in my legs. I think I broke the disc between the L4 and L4." This is a self-diagnosis, with no objective medical evidence to support it.

Yet another assessment done May 14, 2001 reports that plaintiff can climb, balance, stoop, kneel, crouch, and crawl all frequently. (Tr. 572) The assessment continues that plaintiff "does not appear to be in pain," walks normally, and had no difficulty moving about the examining room. (Tr. 572) Further, it reflects that plaintiff can lift 50 pounds occasionally, and 25 pounds frequently, and states that plaintiff is also capable of sitting, standing, and walking 6 hours per 8 hour day. Plaintiff possessed

an "unlimited ability" to push and pull, and had no "manipulative restrictions." (Tr. 573-575)  It is also noted that an "MER does not substantiate the severity of the symptoms" plaintiff alleges. Thomas Hill, M.D., also noted on May 30, 2001 that the plaintiff is capable to remember and carry out simple instructions; keep appointments; maintain attention for at least two hours; and relate to peers and supervisors. (Tr. 595)  Dr. Hill commented negatively on plaintiff's credibility, and referred to him as "dramatic."

On June 21, 2001, Joel Deutsch, M.D. examined plaintiff and found that he had "severe scoliosis" of the thoracic spine, but that his gate was normal, that he had a full range of motion.  Dr. Deutsch found that plaintiff could lift 50 pounds occasionally, and 25 pounds frequently.  In Dr. Deutsch's opinion, plaintiffs could sit, stand, and walk 6 hours per 8 hour day. (Tr. 615) Dr. Deutsch concluded: "The claimant presents with medically determinable impairments which can be expected to have some impact on function. He alleges decreased abilities in all areas due to chronic pain. However, on objective exams he has full ROM, no spasm, normal gate. He is found partially credible, and should avoid heavy exertional work due to chronic pain and fatigue."  (Tr. 619)

The Plaintiff was given the opportunity to produce other medical records and evidence for the period after Dr. Monroe's assessment, but failed to provide it. (Tr. 411)

The ALJ also observed that the plaintiff, who has the burden

of persuasion that he is entitled to benefits, was derelict in filing records to support his claim. The ALJ observed:

> There are no other medical records of [sic] evidence. It is noted for the record that at each of the hearings held before the under- signed . . . counsel was asked to update the record. At the January 2004 hearing Mr. Campagna testified that he was undergoing medical treatment for his various complaints. Again counsel was asked to update the records. As of the date of this decision [July 26, 2004], no such medical documentation has been submitted.
> *    *    *    *
> It is noted for the record that when a con- sultative examination was ordered for him in conjunction with his most recently filed application, Mr. Campagna did not appear at the appointed time and place for the exam- ination.

(Tr. 411)   If medical records existed to support plaintiff's claims, it certainly was not unreasonable of the Commissioner to expect plaintiff to submit them in the circumstances.

It does not fairly appear that the ALJ employed the "sit and squirm test" condemned in <u>Aubeuf v. Schweiker</u>, 649 F.2d 107, 113 and n.7 (2d Cir. 1981). Rather, the ALJ permissibly noted that plaintiff's demeanor at the hearing was not consistent with plaintiff's own description of his condition. There are other things of record that reflect adversely on plaintiff's credibility. These include, for example, plaintiff's professed inability to recall whether he had completed the tenth grade (Tr. 24), and his admitted willingness to tell the methadone dispensary official

"what she really wanted to hear" in order to obtain higher doses of methadone (Tr. 40), which he used along with occasional heroin and cocaine.  (Tr. 40, 66-68, 72, 633)   In sum, it appears that the ALJ fairly considered the entire record in evaluating plaintiff's credibility.  That administrative assessment, which is not likely to change, is adequately articulated in the circumstances.  <u>Marcus v. Califano</u>, 615 F.2d 23, 27 (2d Cir, 1979); <u>Mimms v. Heckler</u>, 750 F.2d 180, 186 (2d Cir. 1984)(ALJ has discretion to evaluate credibility).

### 5. Development of the Record

The plaintiff counsel faults the ALJ for not obtaining records himself and "for not following up with me to obtain them."  The ALJ does not have a duty to pester counsel to abide by representations the attorney has made to the tribunal.  There is no evidence that the ALJ was ever asked to obtain records.  Rather, the ALJ told counsel that it would be imprortant to get in medical records to support plaintiff's claim.  The ALJ invited plaintiff's attorney to suggest a date by which he would get in the records.  Plaintiff's lawyer stated he needed three weeks, and then, again at the ALJ's invitation, picked February 10, 2004 as the date by which he would file the records.  If plaintiff's lawyer was unable to obtain the records by then, he should have asked the ALJ for assistance.  Plaintiff's argument seeks to "fault the ALJ for [his] own failure to support his claim of disability."  <u>Scheck v. Barnhart</u>, 357 F.2d

697, 702 (7th Cir. 2004).  Had such records existed, plaintiff's lawyer could have submitted them not just to the ALJ, but to the Appeals Council.  The burden of producing records to support a claim ordinarily rests on the claimant. 20 C.F.R. §§ 404.1512(d); 404.1545(a)(3); 416.912; 416.945(a)(3).  It is not reasonable to shift that burden here. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5 (1987)("It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.)  The ALJ adequately developed the record in the circumstances.

### 6. Vocational Expert Testimony

Plaintiff finds fault with the ALJ's handling of the vocational expert's testimony.  At the outset, plaintiff asserts the ALJ's first hypothetical was defective because it failed to include the exertional limitation caused by pain.  Plaintiff argues that "[t]he ALJ's purpose in asking such a question is baffling in light of his failure to identify pain as a significant factor. . . ." (Plaintiff's Memorandum at 14).  Plaintiff's befuddlement aside, in the circumstances here, it makes no difference if the ALJ's first hypothetical was defective, since, on the basis of the restrictions which *were* incorporated incorporated into that question, the vocational expert found that there would be no jobs that such an individual could perform.  The result would have been exactly the same if pain had been expressly incorporated into the

first question.  Thus, there is no merit to plaintiff's first argument.

Next, plaintiff attacks the ALJ's second hypothetical. Plaintiff observes that in this "second hypothetical question [the ALJ] appears to pose the restrictions that he intends to find." (Plaintiff's Memorandum at 15)  This is true, but it is not impermissible so long as there is substantial evidence to support the assumed limitations, and there is not an erroneous omission of a limitation.  Aubeuf, 649 F.2d at 114; Dunas v. Schweiker, 712 F.2d 1545, 1553-54 (2d Cir. 1983).  Dr. Jones's 1991 report, the post-Monroe residual functional capacity assessments noted above, and the absence of medical records indicating that plaintiff was treated for other physical limitations provide substantial evidence to support the limitations that were included in the second hypothetical.  The issue, therefore, is whether the ALJ erroneously *omitted* legitimate limitations from the second hypothetical.

That the ALJ resorted to a vocational expert is itself an acknowledgement that plaintiff suffers from at least some non-exertional limitations. The ALJ expressly found, however, that plaintiff's subjective complaints were not completely credible. Common sense, if nothing else, suggests that this means the ALJ believed plaintiff experienced *some* pain, discomfort, and mental restrictions but significantly less than plaintiff claimed.  The hypothetical limitations which the ALJ did pose adequately reflects

both plaintiff's pain and mental restrictions by assuming a residual capacity for *limited* light, low stress work requiring only minimal decision-making, and subject to supervision. While plaintiff faults the ALJ for not "defining" for the record what he meant by "low stress" and "supervised" these are terms that are used every day, and the vocational expert appears to have understoood them. Plaintiff's counsel also appears to have understood the terms, for he used them himself. (Tr. 670)

While it would have been better if the ALJ had developed the record of vocational testimony more, it nonetheless appears adequate in the circumstances. The vocational expert was careful to note that plaintiff had to be considered as falling somewhat below the normal light residual functional capacity. He does not appear to have misunderstood the ALJ's use of the terms "low stress" and "supervised." He acknowledged that a *significant* impairment in concentration would be an impediment to plaintiff's performing work of this nature. By implication, this fairly means that a non-significant impairment would not be an impediment. Though the expert acknowleded that the existence of a production quota could limit the number of available jobs, it is clear from his testimony that the requirement that one maintain a pace would not necessarily rule out the available jobs. The expert testified that, within the paramenters of the ALJ's hypothetical, in the local economy alone there were probably 200 to 300 jobs that were

available to the plaintiff. (Tr. 669-672)

It is true the vocational expert testified that his numbers were "extrapolated" from the grids. But it is not improper for a vocational expert to testify as to the availability of jobs existing between exertional levels. Indeed, it is because cases do not always fit precisely into the grids that the Commissioner is required to use vocational experts. Moreover, in response to the ALJ's question, the vocational expert here certified that his testimony was "not inconsistent with the Dictionary of Occupational Titles, as is required by Social Security Ruling 00-4P." (Tr. 669)

Plaintiff's real complaint is that the ALJ did not believe him. Plaintiff's questions to the expert assumed that plaintiff's subjective complaints regarding impaired concentration and pain were credible. The ALJ's hypotheticals, on the other hand, make plain that the plaintiff's subjective complaints were not believable. There is no requirement that the ALJ incorporate fictions into his hypotheticals as if they were facts. This particular ALJ had not one, but two opportunities to observe the plaintiff and assess his credibility. One does not come away from this case with the feeling that the ALJ erred in this regard or that an injustice has been done.

### 7. Conclusion

Plaintiff's motion to reverse or remand for a fourth ALJ hearing (Dkt. #9) should be **DENIED**. The defendant's cross-motion

to affirm (Dkt. #10) should be **GRANTED**. This opinion is a recommendation. Either party is free to seek review of this opinion and recommendation as provided in 28 U.S.C. § 636(b)(written objections to recommendation must be filed within ten days of service of same); Fed.R.Civ.P. 6(a), 6(e), and 72; and Rule 2 of the Local Rules for United States Magistrate Judges. **Failure to object in a timely fashion may preclude further review.** Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

Dated at Hartford, Connecticut, this 3rd day of April, 2007.

/s/ Thomas P. Smith
Thomas P. Smith
United States Magistrate Judge